# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **D. F. PACE, ESQUIRE,**<br>**Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **EMILY BAKER-WHITE, PLAINVIEW**<br>**PROJECT, AND INJUSTICE WATCH ,**<br>**Defendants.** | **NO. 19-4827** |

## OPINION

In the summer of 2016, a team of attorneys in Philadelphia learned that numerous local police officers had posted content on Facebook that appeared to endorse violence, racism and bigotry. In some of these posts, officers commented that apprehended suspects—often black men—"should be dead" or "should have more lumps on his head." In other Facebook conversations, officers advocated shooting looters on sight and using cars to run over protestors. Numerous posts deemed Islam "a cult, not a religion" and referred to Muslims as "savages" and "goat-humpers." And, in still others, officers appeared to joke about beating and raping women. This discovery inspired the creation of the Plain View Project ("the PVP"), a research project that has identified thousands of Facebook posts and comments by current and former police officers.[1] Defendants published these posts and comments, including one by Plaintiff D.F. Pace, on the PVP website.

Pace, an attorney and inspector within the Philadelphia Police Department ("the PPD"), has sued Injustice Watch, an investigative journalism non-profit which runs the PVP, and Emily

---

[1] This description is taken verbatim from the "About" tab of the PVP website.

Baker-White, its former employee for defamation-by-implication and for putting him in a false light.[2]  Plaintiff's published comment—"Insightful point" —is not the problem here.  Plaintiff's contention broadly is that, when viewed in the context of the PVP's prefatory statements regarding their criteria for inclusion on the website, Defendants' publication of his name and comment implied that he is an officer who endorses violence, racism, and bigotry and who undermines public trust in the police by acting on those biases.  Defendants now move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, their motion will be granted.

## I.    <u>FACTS</u>[3]

The PVP is a website run by Defendant Injustice Watch which compiled comments posted publicly by police officers on their personal Facebook pages.  As set forth above, the "About" tab of the site explains how the PVP came about.[4]  Having described the posts and comments published on the website, verbiage on the "About" tab continues: "We believe that these statements could erode civilian trust and confidence in police, and we hope police departments will investigate and address them immediately."

The methodology used to compile the posts is also described in detail on the PVP website.  In the fall of 2017, Defendants obtained published rosters of police officers employed

---

[2] Although Plaintiff has sued the **"**Plain View Project", according to Defendants it is not a separate legal entity.  It is the name of the website run by Defendant Injustice Watch and on which the post and comments were published.

[3] These facts are drawn from the Complaint and, for the purposes of the motion to dismiss, will be taken as true.  *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[4] The parties agree that the statements of which Plaintiff complains are found on the PVP website and that the website is relied upon in the Complaint.  Accordingly, the relevant pages of the website will be considered in deciding this motion to dismiss.  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("a document integral to or explicitly relied upon in the complaint may be considered") (internal quotations omitted).

by eight jurisdictions across the United States.  They then searched Facebook for the officers' names and made a list of Facebook pages or profiles that appeared to belong to them.  Next, they searched within each profile for verification that the user was in fact the officer named on the rosters and to confirm that the profile was maintained by an identified police officer.  Some users reported specific police departments as their employers; others posted pictures of themselves in uniform.  Some discussed making arrests or performing other police duties.  When a PVP researcher obtained verification and confirmation for a profile, the researcher captured the screen with the verifying information and added it to the PVP's files.

Having compiled a list of more than 3,500 verified accounts, Defendants then reviewed each public post or comment to assess whether they "could undermine public trust and confidence in police."  Ultimately, they included 5,000 posts and comments which they believed "meet this criterion."  Screenshots of each of these posts and comments were placed on the PVP website, the homepage of which states:

> We present these posts and comments because we believe that they could undermine public trust and confidence in our police.  In our view, people who are subject to decisions made by law enforcement may fairly question whether these online statements about race, religion, ethnicity and the acceptability of violent policing—among other topics—inform officers' on-the-job behaviors and choices.

> To be clear, our concern is not whether these posts and comments are protected by the First Amendment.  Rather, we believe that because fairness, equal treatment, and integrity are essential to the legitimacy of policing, these posts and comments should be part of a national dialogue about police.

Visitors to the site can find particular posts and comments through a searchable database organized by officer name, rank, badge number, and jurisdiction.  But, before conducting a search, they are presented with a disclaimer to which they must click "I Understand," or else they cannot proceed.  The disclaimer, which is prominently displayed—centered in the middle of and blocking a significant portion of the viewer's screen—contains the following language:

The Facebook posts and comments in this database concern a variety of topics and express a variety of viewpoints, many of them controversial. These posts were selected because the viewpoints expressed could be relevant to important public issues, such as police practices, public safety, and the fair administration of the law. The posts and comments are open to various interpretations. We do not know what a poster meant when he or she typed them; we only know that when we saw them, they concerned us. We have shared these posts because we believe they should start a conversation, not because we believe they should end one.

. . .

Inclusion of a particular post or comment in this database is not intended to suggest that the particular poster or commenter shares any particular belief or viewpoint with any other poster or commenters in the database. . . .

The disclaimer also explains that the names and faces of non-officers were redacted from the posts as well as the names and faces of officers in comment threads "where their comments could not reasonably affect public trust in policing." Once a visitor has clicked on the "I Understand" link, they are free to search the database and, at least if the search is made on the same computer, the disclaimer does not come up again.

Defendants included in the database Plaintiff's comment posted on Facebook in response to another police officer's post. More specifically, on March 16, 2016, Philadelphia police officer Anthony Pfettscher created a Facebook post discussing the arrest of American Otto Warmbier in North Korea, an international news story at the time.[5] Pfettscher wrote: "I'm cracking up at that America college student that [*sic*] went to North Korea and tried to steal a poster. He is crying and pleading like a little baby girl because he was just sentenced to 15 years hard labor. Although my heart breaks for his family, it's an eye opener to how spoiled and coddled our youth of today are here in this weak PC country. Yet they act like animals and burn and step on our Flag that [*sic*] so many of our children died for defending our rights and our country. #SeeYouIn15Years #WakeUpAmerica #AskWhatYouCanDoForYOURcountry." The

---

[5] Figure 1, presented at the end of this opinion, is a screenshot of Plaintiff's comment as it appears on the PVP website.

PVP website includes six comments to the post, including Plaintiff's, which reads, "Insightful point."[6] Three of the names of the commenters were redacted, three were not. Plaintiff's name was one of the ones that was not.

Plaintiff claims that the inclusion of his comment on the PVP website defamed him and put him in a false light. At oral argument on this motion, upon being asked to specify what exact statements formed the premise of his lawsuit, Plaintiff stated that it was the inclusion of his words "Insightful point" in the context of the PVP's own description of the project on the homepage and the "About" page, as well as statements made in the disclaimer language, that—by implication—defamed and put him in a false light. More specifically, he argues that the website as a whole suggests he belongs "in a set of current and former police officers who endorse violence, racism and bigotry and act[] in manners consistent with these biases in their official capacity"; that he endorses violence, racism and bigotry; that he acts in a manner that undermines public trust in the police; that he is not carrying out his oath of office with integrity; and that he does not treat people equally.[7]

## II.     LEGAL STANDARDS

On a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), factual allegations are scrutinized to determine if the allegations and inferences proposed from

---

[6] Plaintiff's Facebook comment of "Insightful point" could be read to be referring to any number of Pfettscher's statements, *i.e.* Otto Warmbier ("a little baby girl"); America's youth ("spoiled," "coddled," "like animals" who disrespect the flag); America ("weak" and "PC"). Or the comment could be suggesting that the use by the posting officer of any or all of the three hashtags—#SeeYouIn15Years #WakeUpAmerica #AskWhatYouCanDoForYOURcountry—was insightful.

[7] "Pennsylvania courts apply the same analysis to both defamation and false light." *Hill v. Cosby*, 665 F. App'x 169, 177 (3d Cir. 2016) (citations omitted); *see also Fraternal Order of Police Phila. Lodge No. 5 v. The Crucifucks*, 1996 WL 426709, at *4 (E.D. Pa. July 29, 1996). Defendants raise the same arguments for the false light claims as for the defamation claims, and they will therefore be analyzed together.

those allegations are plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court is required to "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). The relevant question is not whether the claimant "will ultimately prevail . . . but whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 531 (2011).

## III.   ANALYSIS[8]

Defendants argue that Plaintiff's claims must be dismissed because: they are barred by the Communications Decency Act; the inclusion of Plaintiff's comment on the PVP website is not capable of defamatory meaning; Plaintiff's claims are based on Defendants' opinions and therefore are not actionable as a matter of law; and, Plaintiff has failed to plead actual malice.

### A.  Communications Decency Act

Defendants assert they are immune from this lawsuit under Section 230 of the Communications Decency Act ("the CDA" or "the Act"), 47 U.S.C. § 230,[9] which bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Section 230(c)(1) specifically provides

---

[8] Federal courts sitting in diversity must apply the substantive law of the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Pennsylvania law therefore governs this case.

[9] There is some dispute as to whether Section 230 is an immunity or not. For example, the Seventh Circuit, reads "§ 230(c)(1) as a definitional clause rather than as an immunity from liability." *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003). The Third Circuit has determined that it is an immunity. *See Green v. America Online*, 318 F.3d 465, 470 (3d Cir. 2003).

that: "No provider or user of an interactive computer shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[10] The term "interactive computer service" is defined in relevant part as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server. . . . " *Id.* at § 230(f)(2). The term "information content provider" means "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* at § 230(f)(3). Thus, CDA immunity applies where: (1) the defendant is a user or provider of an "interactive computer service"; (2) the asserted claim seeks to treat the defendant as publisher of the challenged communication; and (3) the challenged communication is "information provided by another information content provider." *Dimeo v. Max*, 433 F. Supp.2d 523, 529 (E.D. Pa. 2006), *aff'd*, 248 F. App'x 280 (3d Cir. 2007).

The battle here is over the third element—whether the challenged communications are "information provided by *another* information content provider." While it is uncontroverted that Plaintiff wrote the words "Insightful point," the parties diverge as to how the prefatory language included by Defendants on the PVP website should inform the Section 230 analysis.

Defendants argue that because they were not the author of the words "Insightful point" (Pace was), and because the publication of someone else's content even if the publisher selected and edited the content does not transform such publisher into the creator or developer of the content, *i.e.* into an information content provider, their decision to publish Pace's words is protected by Section 230. And, in support of this proposition, they cite to a long line of cases.

---

[10] The CDA's preemption clause establishes that Section 230(c)(1) overrides traditional treatment of publishers under statutory and common law. "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

*See Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015); *Carafano v. Metrosplash.com,*

*Inc.*, 339 F.3d 1119, 1120-24 (9th Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online,*

*Inc.*, 206 F.3d 980, 985 (10th Cir. 2000); *DiMeo*, 433 F. Supp.2d at 530; *Blumenthal v. Drudge*,

992 F. Supp. 44, 49-53 (D.D.C. 1998).

Plaintiff, to the contrary, maintains that this matter is different from the run-of-the-mill

Section 230 case. Here, he argues, Defendants were both service and content providers in that

they did much more than simply package and publish his words: Rather, they published them

with prefatory content they created which necessarily informed readers' understanding of his

words. In support of this position, he cites to *Fair Housing Council v. Roommates.com, LLC*, in

which the Ninth Circuit found that "[a] website operator can be both a service provider and a

content provider: If it passively displays content that is created entirely by third parties, then it is

only a service provider with respect to that content. But as to content that it creates itself, or is

responsible, in whole or in part for creating or developing, the website is also a content provider.

Thus, a website may be immune from liability for some of the content it displays to the public

but be subject to liability for other content." 521 F.3d 1157, 1162-63 (9th Cir. 2008) (en banc)

(internal quotations omitted).

Distilled to its essence, Plaintiff's argument is that because Defendants contextualized his

comment with content of their own—thus by implication suggesting that he endorsed violence,

racism, and bigotry and acted in a manner consistent with those biases in carrying out his duties

as a police officer—Defendants cannot find protection (at least on the facts alleged here) under

the aegis of Section 230.

Certainly, while courts construe Section 230 broadly, *see Nemet Chevrolet, Ltd. v.*

*Consumeraffairs.com, Inc.*, 591 F.3d 250, 257 (4th Cir. 2009) (collecting cases), the immunity it

bestows is not unlimited. Section 230 cases exist along a continuum, with "internet service providers" being immunized while "content providers" are not. Along that continuum are various levels of editorial control, ranging from merely hosting, curating, or positioning content; through editing, to framing, and creating content. The question here is where along that continuum Defendants' commentary lie.

One end of the continuum is populated by cases in which an interactive computer provider merely hosts or republishes defamatory content. In such cases, the provider is protected by Section 230. *See Cubby, Inc. v. Compuserve*, 776 F. Supp. 135, 137-40 (S.D.N.Y. 1991) (immunizing webpage known as "Rumorville" for being merely an electronic library with "no more editorial control over . . . a publication than does a public library, book store, or newsstand"). Most Section 230 cases fall into this category. *See, e.g.*, *Green*, 318 F.3d at 471 (immunizing America Online from liability for defamatory statements John Does made in chatrooms); *Obado*, 612 F. App'x at 93 (immunizing defendants, including Yahoo!, Inc. and Google, Inc., where the "allegedly actionable content originated from" two bloggers and defendants merely reposted); *Zeran*, 129 F.3d at 331-32 (immunizing America Online from liability for anonymous Internet poster who created fake ads about plaintiff in online forum); *Chicago Lawyers' Comm. v. Craiglist, Inc.*, 519 F.3d 666, 668 (7th Cir. 2008) (immunizing Craigslist from liability for hosting offensive and racist housing ads); *Carafano*, 339 F.3d at 1120-24 (immunizing online dating website from claim over allegedly false content on a user's dating profile because "Matchmaker did not play a significant role in creating, developing or 'transforming' the relevant information"); *Novins v. Cannon*, 2010 WL 1688695, at *2 (D.N.J. Apr. 27, 2010) (immunizing website against claim for republishing allegedly defamatory content); *Mitan v. Neumann & Assocs.*, 2010 WL 4782771, at *4-*5 (D.N.J. Nov. 17, 2010)

(immunizing email alert provider for same).

Further along the continuum are those cases which feature defendants curating information, including selecting what gets posted or excluded. For example, in *Reit v. Yelp! Inc.*, the court immunized Yelp! against a dentist's defamation claims, where the site had selectively removed positive reviews of his practice but left negative ones. *See* 907 N.Y.S.2d 411, 412-13 (N.Y. Sup. Ct. 2010). The court found that "Yelp's selection of the posts it maintained on Yelp.com was the selection of material for publication, an action 'quintessentially related to a publisher's role.'" *Id.* at 414 (citing *Green*, 318 F.3d at 471).

Still other cases address positioning or increasing the prominence of allegedly defamatory content. The court in *Asia Economic Institute v. Xcentric Ventures, LLC* held that Section 230 immunity applied where the defendant added indexing tags to increase the prominence of web pages in Google searches. 2011 WL 2469822, at *6 (C.D. Cal. May 4, 2011). "[I]ncreasing the visibility of a statement is not tantamount to altering its message . . . . At best, increasing the visibility of a website in internet searches amounts to 'enhancement by implication,' which is insufficient to remove Defendants from the ambit of the CDA. Absent a changing of the disputed reports' substantive content that is visible to consumers, liability cannot be found." *Id.*; *see also Small Justice LLC v. Xcentric Ventures, LLC*, 2014 WL 1214828, at *7-*8 (D. Mass. Mar. 24, 2014) ("[M]erely endeavoring to increase the prominence of Xcentric's site among Google's search results does not make Xcentric an information content provider under the CDA.").

In some cases, defendants engage in editing or make editorial judgments, which triggers arguments about what constitutes content editing versus content creation. In *Dimeo*, the defendant ran a website with message boards on which third parties posted allegedly defamatory

comments about the plaintiff. The defendant "[did] not dispute that he select[ed], remove[d], and alter[ed] posts on the message boards," and the plaintiff argued that in doing so, the defendant developed defamatory content. 433 F. Supp.2d at 527. Nevertheless, the court held that "development of information must mean something more than merely editing portions of [content] and selecting material for publication." *Id.* at 530 (internal quotations omitted). In *Blumenthal*, another district court found that interactive service providers are not liable for content prepared by others—even if the provider solicits that content and retains some control over it. 992 F. Supp. at 52. A gossip columnist had entered into a written licensing agreement with America Online, which made his column available to all of America Online's members for a year. The plaintiff argued that because America Online paid the defendant $3,000 a month to create the allegedly defamatory content and reserved the right in its agreement to remove content or require reasonable changes, it therefore exercised editorial control and should not be immunized by the CDA. *Id.* at 51. The court disagreed, holding that while "it would seem only fair" to make America Online liable for the defendant's allegedly defamatory statements, "Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others." *Id.* at 51-52.

Other cases involve defendants who added their own commentary to third-party statements, but the plaintiffs only alleged the third-party statements were defamatory, *not* the defendants' commentary. *See Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 416 (6th Cir. 2014) (granting Section 230 immunity to gossip website where it reposted allegedly defamatory third-party statements and plaintiff "did not allege that [defendant's] comments were defamatory"); *Marifone v. KAI U.S.A., Ltd.*, 2018 WL 1519042, at *6-*8 (W.D. Pa. Mar. 28,

2018) (granting Section 230 immunity where the action was "not [for] any statements made by [defendants] on the [Instagram] posts themselves" and the allegations about the defendants contributing to the allegedly defamatory article were insufficiently pled); *Shiamili v. Real Estate Group of New York, Inc.*, 952 N.E.2d 1011, 1019 (N.Y. June 14, 2011) (granting Section 230 immunity where defendants added a headline to objectionable third-party posts, but defendants' additions were not alleged to be defamatory).

At the far end of the continuum, content creators and developers are not entitled to Section 230 immunity. *See Roommates*, 521 F.3d at 1166; *see also Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016); *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009). In *Roommates*, the Ninth Circuit *en banc* declined Roommates.com immunity where the roommate-matching website had solicited user preferences and provided selective content based on those choices. *See* 521 F.3d at 1166. The website required subscribers to answer certain questions and supplied a limited set of pre-populated answers, including about the subscriber's sex, family status, and sexual orientation. *Id.* at 1161. The website then assembled the answers into a profile page, which made the website "much more than a passive transmitter" and resulted in a "collaborative effort between Roommate and the subscriber" and, therefore, made Roommates.com ineligible for Section 230 immunity. *Id.* at 1166-67. In its analysis, the Ninth Circuit set out a test, which has been adopted by other Circuits, for analyzing a defendant's "material contribution" to the creation or development of defamatory content. The court drew a "crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or objectionable." *Jones*, 755 F.3d at 414; *see also Roommates*, 521 F.3d at 1172 (providing "neutral tools" that a third-party used to

create offensive content is not "development" under Section 230); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) (same).

In *Huon*, the Seventh Circuit found the *Roommates* line had been crossed where Gawker, an online tabloid operator, allowed its employees to author comments on the Gawker site about a person who had been acquitted of a criminal sexual assault in order to drive online traffic to its article about the acquittee. 841 F.3d at 742. The court found that the added comments by Gawker employees made Gawker a "content provider," and thus the site was not entitled to CDA protection. *Id.* at 743.

This case does not fall neatly into any of the aforementioned categories along the continuum. It presents the reverse of the scenarios in *Jones* and *Marifone*. There, the plaintiffs sought to hold the defendants liable for reposting allegedly defamatory third-party statements— *not* for commentary that the defendants made regarding those statements. Here, by contrast, Plaintiff is seeking to hold Defendants liable for what the *Defendants' own words*—when read in conjunction with a non-defamatory statement he made on Facebook—imply about him. The third-party statement here is the Plaintiff's Facebook comment which is not, by itself, defamatory. Give the distinctive nature of this case, the Court returns to the text of the statute to analyze the facts here.

The CDA states: "No provider or user of an interactive computer shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, an information provider may claim Section 230 immunity only with respect to information provided by a content provider other than itself. *Accusearch*, 570 F.3d at 1196. However, if an entity is "responsible, in whole or in part, for the creation or development of information" that forms the subject matter of the lawsuit, it is *itself* a content provider and is

not protected.  47 U.S.C. § 230(f)(3).

The key terms in Section 230(f)(3) are not defined in the CDA.  Thus, they must be construed "in accordance with [their] ordinary meaning," *Sebelius v. Cloer,* 569 U.S. 369, 376 (2013), as determined by dictionary definitions as well as reference to "the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."  *See United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) (citing *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

"A key limitation in Section 230 . . . is that immunity only applies when the information that forms the basis for the state law claim has been provided by '*another* information content provider.' . . .  Thus, an interactive computer service provider remains liable for its own speech."  *Universal Comm. Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007); *see also Blumenthal*, 992 F. Supp. at 50 (recognizing that Section 230 would not immunize a defendant with respect to any information it developed or created "entirely by itself"); *Huon*, 841 F.3d at 742 (noting that a company is liable for "creating and posting . . . a defamatory statement in a forum that company maintains").  Here, although Defendants published Plaintiff's words on the PVP, they readily acknowledge that they provided the words on the introductory pages of the PVP website—a framing narrative through the website's homepage, disclaimer, and "About" tab. Defendants here do not deny that they authored these words.  Instead they argue that their selection of which posts to publish on the website does not equate to the "creation" of these posts.

But, this lawsuit does not arise from the selection of Plaintiff's comments to publish on the PVP website.  It is premised on the inclusion of his and other officer's comments and posts on the website <u>as prefaced by</u> statements explaining why those posts and comments were

included.  Defendant's citations in support of their position are, accordingly, inapposite.  In adding the framing narrative, Defendants did much more than merely "packaging and contextualizing[,]" structuring a website layout, increasing content's prominence, or selecting what to publish.  *See Green*, 318 F.3d at 471; *Obado*, 613 F. App'x at 93; *Nemet*, 591 F.3d at 257-58; *Small Justice*, 2014 WL 1214828, at *7.  Nor does the content Defendants added constitute mere "editorial parameters" or selection criteria.  *Evans v. Hewlett-Packard Co.*, 2013 WL 5594717, at *4 (N.D. Cal. Oct. 10, 2013).  Unlike in *Jones*, 755 F.3d at 416, where the defendant's added commentary was not itself tortious and did not contribute to the allegedly defamatory nature of the third-party statements, here it is Defendants' added commentary that is being challenged.

Dictionary definitions of the word "creation" lead to the conclusion that the prefatory commentary was "created" by the Defendants.  The word has many meanings, but as relevant here, The Oxford English Dictionary defines it is as "[a]n original production of human intelligence, power, skill or art," and "[t]he action or process of bringing something into existence from nothing, . . . the fact of being so created."  *See Oxford English Dictionary Online*, www.oed.com/view/Entry/44061 (last visited Jan. 10, 2020).  The Merriam-Webster Dictionary defines it as "something that is created."  *See The Merriam-Webster Dictionary,* https://www.merriam-webster.com/dictionary/create (last visited Jan. 10, 2020).  Here the words Defendants included on the PVP website were original, having had no existence prior to their being authored by Defendants and, as such, they were created by Defendants.

The fact that Plaintiff's claims necessarily involve evaluating his statement in the context of the statements made by Defendants does not undermine this conclusion.  Section 230 does not only cover the creation of content that is created in its entirety by a party, it also covers those

who are responsible "in part" for the creation of content. *Accusearch*, 570 F.3d at 1197 (citing

*Lycos*, 478 F.3d at 419). "Accordingly, there may be several information content providers with

respect to a single item of information (each being 'responsible,' at least 'in part,' for its

'creation or development')." *Id.* at 1187; *see also Blumenthal*, 992 F. Supp. at 50 ("Section 230

does not preclude joint liability for the joint development of content"). Here, Plaintiff's

words—"Insightful point"—are not in and of themselves defamatory. The defamatory

implication arises, according to Plaintiff, from its framing by the introductory text created by

Defendants. One could conclude from that Defendants created that content "in whole." Even so,

to extent that one could conclude that, absent Plaintiff's words, there could be no defamation by

implication, and that as such Defendants were not the sole author of the allegedly defamatory

statements, they nevertheless are responsible for it in part.

      In focusing on whether Defendants are "responsible" for the framing content on the PVP

website, dictionary definitions once again lead to the conclusion that they are. To be responsible

for a harm is to be "accountable for one's actions" or to be "the cause or originator of something;

deserving of credit or blame *for* something." *See Oxford English Dictionary Online*,

www.oed.com/view/Entry/163863 (last visited Jan. 8, 2020). Thus, to be responsible for

offensive content, "one must be more than a neutral conduit." *Accusearch*, 570 F.3d at 1199.

"That is, one is not 'responsible' for the development of offensive content if one's conduct was

neutral with respect to the offensiveness of the content (as would be the case with the typical

Internet bulletin board). We would not ordinarily say that one who builds a highway is

'responsible' for the use of that highway by a fleeing bank robber, even though the culprit's

escape was facilitated by the availability of the highway." *Id.* Thus, "a service provider is

'responsible' for the development of offensive content only if it in some way specifically

encourages development of what is offensive about the content." *Id.* Such a construction of the term "responsible"—requiring more than neutral conduct or the mere providing of a platform—satisfies the CDA's purpose, which is to encourage the flow of information online by protecting Internet services from liability when third-parties use the services to post harmful content. *See* 47 U.S.C. § 230(a)-(c).

Here, the PVP website was not a "typical Internet bulletin board[,]" neutrally facilitating the sharing of harmful content. *See Accusearch*, 570 F.3d at 1199. It was "much more than a passive transmitter." *See Roommates*, 521 F.3d at 1166. Defendants created the introductory narrative on the PVP website thereby making a material contribution to the creation of the allegedly defamatory content, and are therefore "responsible . . . for the creation or development of information" at the core of this lawsuit. *See* 47 U.S.C. § 230(f)(3). Accordingly, they are not entitled to Section 230 immunity.

### B. Defamation

Because Defendants are not protected by Section 230 of the CDA, the Court turns to evaluating Plaintiff's defamation claims. In Pennsylvania, the plaintiff in a defamation action bears the burden of proving: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. C.S.A. § 8343(a).

In addition, in a suit alleging the defamation of a public official, the First Amendment requires the plaintiff to establish that in publishing the statement the defendant acted with "actual malice—that is, with the knowledge that it was false or with reckless disregard of whether it was

false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562 (Pa. Super. 2005). The parties agree that Plaintiff is a public official who, as such, must plead and prove actual malice.[11] *Id.* at 567; *Stickney v. Chester Co. Comms., Ltd.*, 522 A.2d 66, 69 (Pa. Super. 1987).

Defendants argue that the inclusion of Plaintiff's Facebook comment on the PVP website is not capable of a defamatory meaning, that Plaintiff's claims are based on Defendants' opinions and are therefore not actionable as a matter of law, and that Plaintiff has not and cannot plead actual malice.[12]

### i. Defamatory Meaning/Opinion[13]

As an initial matter, the Court must determine whether the communications complained of are capable of a defamatory meaning. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923 (3d Cir. 1990); *City of Rome v. Glanton*, 958 F. Supp. 1026, 1041 (E.D. Pa. 1997). "A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from

---

[11] During his eighteen years at the PPD, Plaintiff has served as a patrol officer, sergeant, and lieutenant, and he now oversees the PPD Police Board of Inquiry, which is responsible for disciplining PPD members when a departmental violation occurs.

[12] After oral argument, the Court permitted focused supplemental briefing on one of Defendants' Section 230 arguments. In their supplemental briefing, Defendants went beyond their permit and included a new argument, not included in their motion to dismiss, to the effect that the PVP website is not sufficiently "of and concerning" Plaintiff to be defamatory to him. As such, the Court disregards it. *See United States v. Medco Health Solutions, Inc.*, 2017 WL 63006, at *6 n.6 (disregarding new arguments raised in supplemental briefing that were not responsive to the court's request for limited supplemental briefing); *see also McWreath v. Range Resources-Appalachia, LLC*, 645 F. App'x 190, 197 (3d Cir. 2016) (Jordan, J., concurring) (noting "new arguments made in a supplemental filing" are the "functional equivalent of an extra reply brief"); *United States v. Cruz*, 757 F.3d 372, 387-88 (3d Cir. 2014) (arguments raised for the first time in a reply brief are waived).

[13] Although Plaintiff advances a claim of defamation-by-implication, he sometimes refers to defamation-by-innuendo. Courts often analyze defamation-by-implication and -innuendo interchangeably. *See, e.g.*, *Mzamane v. Winfrey*, 693 F. Supp.2d 442, 477 (E.D. Pa. 2010) ("Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo.") (collecting cases). Regardless, at oral argument, Plaintiff clarified that he is proceeding on a defamation-by-implication theory.

associating or dealing with him." *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. 1995); *see also* Restatement (Second) of Torts § 559. The determination of whether the communication is defamatory focuses on "the effect [the statement] is fairly calculated to produce, the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate." *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987). Even where there is a plausible innocent interpretation, if there is an alternative defamatory interpretation, the issue must proceed to a jury to determine if the defamatory meaning was understood by the recipient. *Pelagatti v. Cohen*, 536 A.2d 1337, 1345 (Pa. Super. 1987), *app. denied*, 548 A.2d 256 (Pa. 1988); *see also Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013).

"In making this determination, the Court must address two questions: (1) whether the communication was reasonably capable of conveying the particular meaning ascribed to it by the plaintiff; and (2) whether that meaning is defamatory in character." *Fraternal Order*, 1996 WL 426709, at *4. When the implication alleged by the plaintiff is not "reasonably susceptible of a defamatory meaning," the plaintiff has failed to state a claim. *See Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 191 (3d Cir. 1999); *Thomas Merton Center v. Rockwell Int'l Corp.*, 442 A.2d 213, 215-16 (Pa. 1981).

Defendants argue that the disclaimer on the PVP website renders the statements of which Plaintiff complains not reasonably capable of conveying the meaning he ascribes to them. Plaintiff seeks to minimize the import of the disclaimer, arguing that it is presented only after the home page piques the visitor's interest; it may easily be overlooked; its positioning and length make it likely that a viewer would fail to read it; and it is only presented to the viewer the first time he or she enters the site. These arguments are not supported by screenshots of the disclaimer from the website:





As the screenshots show, the disclaimer is prominent, robust, and presented in easily readable font.  Reading just the first two paragraphs would suffice to explain to a viewer that the content on the PVP website is open to debate.  Indeed, the first heading, "Multiple Meanings," suggests the PVP website content is open to many interpretations.[14]

Turning now to the statements of which Plaintiff complains, for the reasons set forth below, the Court finds that they are inactionable opinions.

"Only statements of fact, not expressions of opinion, can support an action for defamation."  *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005).  Despite this general rule, an opinion that could reasonably be understood to imply undisclosed defamatory facts may support a cause of action based upon those unenumerated facts.  *See Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001).  An opinion that could not reasonably be construed as implying such facts will not substantiate a defamation claim.  *See Cornerstone Sys. v. Knichel Logistics, L.P.*, 255 F. App'x 660, 665 (3d Cir. 2007).  Whether a statement is a fact or an opinion is a question of law.  *Kerrigan v. Otsuka Am. Pharm, Inc.*, 560 F. App'x 162, 168 (3d Cir. 2014).

Cases in which challenged statements feature equivocal or cautionary language are routinely dismissed because the statements are non-actionable opinion.  *See, e.g.*, *Purcell v. Ewing*, 560 F. Supp.2d 337, 340 (M.D. Pa. 2008) (finding statements that alumnus looked like "someone accused of child molestation" was non-actionable opinion); *In re Maze*, 1999 WL

---

[14] None of the cases cited by the parties in their arguments regarding the disclaimer are sufficiently analogous to inform the Court's opinion here.  *Stanton v. Metro Corporation*, 438 F.3d 119, 126 (1st Cir. 2016), was about a disclaimer published in small font next to an article and photograph about teenage sexual behavior.  *Spilfogel v. Fox Broad. Co.*, 2009 U.S. Dist. LEXIS 139784, at *1-*2 (S.D. Fl. Dec. 1, 2009), was about an episode of COPS, which featured disclaimers before and during the episode.  Other cases do not feature a disclaimer.  *See MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050, 1054 (Pa. 1996); *Davis v. Resources for Human Dev., Inc.*, 770 A.2d 353, 357 (Pa. Super. 2001); *City of Rome*, 958 F. Supp. at 1041; *Clemente v. Espinosa*, 749 F. Supp. 672, 679 (E.D. Pa. 1990); *Frederick v. Reed Smith Shaw & McClay*, 1994 U.S. Dist. LEXIS 1809 (E.D. Pa. 1994).

554600, at *2 (E.D. Pa. July 16, 1999) (finding statement in letter that plaintiff failed to pay taxes, "which money he seemingly misappropriated from his employees[,]" was non-actionable opinion); *see also Reardon v. Allegheny College*, 926 A.2d 477, 484 (Pa. Super. 2007) (finding use of the phrase "might have" rendered statement non-actionable because it was "a strong indication that this statement [was] merely one outlining possibilities").

The disclaimer includes crucial contextual language, including that the Facebook posts in the database "could be relevant to important public issues" and "are open to various interpretations.  We do not know what a poster meant when he or she typed them. . . ."  The disclaimer next states:

> The posts and comments included in the database comprise portions of a user's public Facebook activity, and *are therefore not intended* to present a complete representation of each person's Facebook presence, or each person's views on any given subject.  Inclusion of a particular post or comment in this database *is not intended to suggest that the particular poster or commenter shares any particular belief or viewpoint with any other posts or commenters in the database.*

(all emphasis added).

As the language of the disclaimer shows, Defendants were "merely . . . outlining possibilities."  *See Reardon*, 926 A.2d at 484.  The disclaimer is replete with "hedging language" such as "could", "[w]e do not know", "we believe," *etc.* indicating that Defendants are suggesting possibilities, not expressing certainties.  *See Alaskaland.com, LLC v. Cross*, 357 P.3d 805, 821 (Alaska 2015); *see also Others First, Inc. v. Better Business Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 582 (8th Cir. 2016) (finding statements couched in "equivocal language" such as "appears" and "may" to be non-actionable opinion).  "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.).  The statements

of which Plaintiff complains fall into that bucket and are accordingly non-actionable opinion.

In sum, the implications that Plaintiff belongs to a set of current and former police officers who endorse violence, racism, and bigotry and act in manners consistent with these biases in their official capacity; that Plaintiff endorses violence, racism, and bigotry; that Plaintiff is not carrying out his oath of office with integrity; that Plaintiff acts in a manner that undermines trust in police; and that he does not treat people equally are not capable of defamatory meaning. They are statements of opinion by Defendants that readers *could* view Plaintiff in that way—leaving open the possibility that they also *could not*.

### ii.    Actual Malice

Plaintiff's claims fail for the additional reason that he has not sufficiently pled actual malice.

The parties do not dispute that as an inspector with a leadership role within the PPD, Plaintiff is a public official who must properly plead actual malice for his defamation claim to progress. *See St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1317 (3d Cir. 1994). "Actual malice" in constitutional law is "a term of art denoting deliberate or reckless falsification." *Masson v. New Yorker Magazine*, 501 U.S. 496, 499 (1991); *see also Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 666 (1989) ("emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term"). For actual malice, "neither negligence nor failure to investigate, on the one hand, nor ill will, bias, spite, nor prejudice, on the other, standing alone, [are] sufficient to establish either a knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used." *St. Surin*, 21 F.3d at 1317 (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969)). "Reckless disregard" requires a showing that the defendant either "in fact

entertained serious doubts as to truth of [the] publication," *St. Amant v. Thompson*, 390 U.S. 727,

731 (1968), or had a "high degree of awareness of . . . probable falsity[,]" *Garrison v. Louisiana*,

379 U.S. 64, 74 (1964).  The Third Circuit has also held that the actual malice standard is higher

in defamation-by-implication cases, requiring a showing beyond knowledge of or recklessness

regarding the falsity of the statement's defamatory meaning:

> [I]n defamation-by-implication cases, showing known falsity alone is inadequate
> to establish an intent to defame.  In these cases, we may no longer presume with
> certainty that the defendants knew they were making a defamatory statement
> because the statement has defamatory and nondefamatory meanings.  Therefore, in
> such cases, plaintiffs must show something that establishes defendants' *intent* to
> communicate the defamatory meaning.

*Kendall*, 716 F.3d at 90 (emphasis added).

In the wake of *Iqbal* and *Twombly*, "adequately pleading actual malice is an onerous

task[.]"  *Earley v. Gatehouse Media Pennsylvania Holdings, Inc.*, 2015 WL 1163787, at *2

(M.D. Pa. Mar. 13, 2015); *see, e.g.*, *Iqbal*, 556 U.S. at 687 ("Rule 8 does not empower [plaintiff]

to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect

his complaint to survive a motion to dismiss.").[15]  And it is one that regularly results in early

dismissal of an action.  *See, e.g.*, *McCafferty v. Newsweek Media Grp., Ltd.*, 2019 WL 1078355,

at *6 (E.D. Pa. Mar. 7, 2019) (dismissing complaint with prejudice, in part because plaintiffs

---

[15] The Eleventh Circuit has eloquently articulated why meeting the *Iqbal* and *Twombly* standard is especially crucial in defamation suits against public officials:

> In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the
> necessity of defending against expensive yet groundless litigation. Indeed, the actual malice
> standard was designed to allow publishers the 'breathing space' needed to ensure robust reporting
> on public figures and events.  Forcing publishers to defend inappropriate suits through expensive
> discovery proceedings in all cases would constrict that breathing space in exactly the manner the
> actual malice standard was intended to prevent.  The costs and efforts required to defend a lawsuit
> through that stage of litigation could chill free speech nearly as effectively as the absence of the
> actual malice standard altogether.

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

"failed to sufficiently allege actual malice"); *Earley*, 2015 WL 1163787, at *3 (dismissing complaint with prejudice for "fail[ing] to provide any facts that could plausibly demonstrate that defendant acted with actual malice"); *Biro v. Conde Nast*, 807 F.3d 541, 546-47 (2d Cir. 2015) (affirming dismissal of defamation action where plaintiff's nonconclusory allegations against defendants fell "short of raising a plausible inference of actual malice"); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 57-58 (1st Cir. 2012) (affirming dismissal of complaint where none of plaintiff's pleadings "plausibly suggested that defendant acted with actual malice"); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (affirming dismissal of defamation action on the pleadings for failure to plausibly suggest actual malice); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) (same).

A review of Plaintiff's Complaint reveals that he has failed to plead actual malice. The Complaint makes no reference to key actual malice terms like "knowledge of falsity" and does not contain any factual allegations that suggest such knowledge. It merely recites that Defendants acted in a "malicious, intentional and reckless" manner. Although in his brief Plaintiff asserts that Defendants engaged in "obvious and apparent journalistic misconduct[,]" such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[,]" and the Court must disregard them. *See Iqbal*, 556 U.S. at 678.

Further, at oral argument, Plaintiff pointed to two paragraphs of the Complaint in support of his actual malice argument—but neither of them do. The first one states: "Plaintiff D F Pace has ***never*** made any type of post which denigrates persons on the basis of race, color, religion, ethnicity, sex or sexual orientation. He detests such attitudes." (emphasis in original). Plaintiff used this allegation to suggest that if Defendants had investigated Plaintiff, they would have found he does not meet the PVP website's criteria and would not have included his post. But

"[f]ailure to investigate, without more, does not demonstrate actual malice." *Marcone v. Penthouse Int'l Magazine*, 754 F.2d 1072, 1083 (3d Cir. 1985) (citing *St. Amant*, 390 U.S. at 731). Plaintiff would have to plead facts that Defendants "purposefully avoided further investigation with the intent to avoid the truth." *Michel*, 816 F.3d at 703.

The second paragraph of the Complaint to which Plaintiff refers as evidence of actual malice contains the following quote published in *The Guardian* newspaper on June 25, 2019 and attributed to Defendant Baker-White: "When I look at those posts I don't see them as individual posts at this point. . . . I see them in the aggregate as a body of statements and they seem like they're part of a larger narrative that exists in American policing, one that at times encourages violence or endorses vigilantism and discriminates against minority communities." But Defendant Baker-White's perspective on the Facebook posts, as stated to a newspaper after the PVP website launched, does not plausibly suggest actual malice in selecting Plaintiff's comment for reposting on the site. The statement does not reveal that Defendant Baker-White "entertained serious doubts as to truth of [the] publication," *St. Amant*, 390 U.S. at 731, or had a "high degree of awareness of . . . probable falsity." *Garrison*, 379 U.S. at 74.

Plaintiff has not pled actual malice, and for this additional reason, the Complaint must be dismissed.[16] An appropriate order follows.

**January 13, 2020**                             **BY THE COURT:**

                                         **/s/Wendy Beetlestone, J.**

                                         _____
                                         **WENDY BEETLESTONE, J.**

---

[16] The Complaint is dismissed with prejudice. Although leave to amend should be freely granted "when justice so requires . . . a court may deny leave to amend when such amendment would be futile." *Budhun v. Reading Hosp. and Medical Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (internal quotations omitted). "Amendment would be futile if the amended complaint would not survive a motion to dismiss for failure to state a claim." *Id.* Plaintiff offers no facts—nor can he—to plausibly support Defendants' knowledge of falsity of any of the challenged statements, and he therefore cannot sufficiently plead actual malice to state a defamation claim.

**Figure 1 (Plaintiff's comment).**

